# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| MARIA ANDREA MEZERHANE DE SCHNAPP, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES, <br><br> Defendant. | Civil Action No. 13-1461 (JDB) |

## MEMORANDUM OPINION

Before the Court are [16] [18] the parties' cross-motions for summary judgment in this action seeking the disclosure of agency records under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. Only 47 pages remain in dispute. Defendant United States Citizenship and Immigration Services ("USCIS") claims that these 47 pages are properly withheld under various FOIA exemptions—some in full, some in part. Plaintiff Maria Andrea Mezerhane de Schnapp ("Mezerhane") disagrees. Recently, USCIS produced the disputed documents to the Court, in unredacted form, for in camera review. After a careful review of the documents in question, and for the reasons set forth below, the Court will grant USCIS's motion for summary judgment in substantial part, and deny Mezerhane's cross-motion in its entirety. USCIS's exemption claims will be upheld for 42 of the 47 pages in dispute. For the remaining five pages, both parties' motions will be denied at this time, as a factual question remains—specifically, whether the documents are predecisional and protected by the deliberative-process privilege and, thus, FOIA Exemption 5.

## **LEGAL STANDARD**

FOIA requires federal agencies to release all records responsive to a proper request, except those protected from disclosure by any of nine enumerated exemptions set forth at 5 U.S.C. § 552(b). A district court is authorized "to enjoin [a federal] agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant." 5 U.S.C. § 552(a)(4)(B); see also Kissinger v. Reporters Comm. for Freedom of the Press, 445 U.S. 136, 139 (1980). The agency has the burden of proving that "each document that falls within the class requested either has been produced, is unidentifiable, or is wholly exempt from the Act's inspection requirements." Goland v. CIA, 607 F.2d 339, 352 (D.C. Cir. 1978) (internal citation and quotation marks omitted); accord Maydak v. U.S. Dep't of Justice, 218 F.3d 760, 764 (D.C. Cir. 2000).

"FOIA cases typically and appropriately are decided on motions for summary judgment." Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009). Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In a FOIA case, the district court may award summary judgment to an agency on the basis of information provided in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981); accord Vaughn v. Rosen, 484 F.2d 820, 826 (D.C. Cir. 1973).

# ANALYSIS

Much of Mezerhane's briefing tells the story of how USCIS "kept [her] and her family members in immigration limbo for more than three years," Pl.'s Cross-Mot. for Summ. J. ("Pl.'s MSJ") [ECF No. 18] at 2, despite the clear strength of their asylum applications (all of which have now been granted). Ultimately, most—but not all—of this history is irrelevant to the legal questions now before the Court: that is, whether USCIS properly withheld portions of 47 pages of documents under various FOIA exemptions. For the vast majority of the disputed records, the Court finds that USCIS made proper exemption claims. For five pages, perplexing internal contradictions in the record preclude summary judgment for either party at this time.[1]

## I. USCIS Properly Invoked FOIA Exemption 7(E) to Protect Law Enforcement Techniques and Procedures

USCIS argues that much of the withheld information is exempt from disclosure under FOIA Exemption 7(E), which protects "records or information compiled for law enforcement purposes . . . to the extent that the production" of such records "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

Under D.C. Circuit precedent, "Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented,'" this exemption "'only requires that the agency demonstrate logically how the

---

[1] In addition to her specific challenges to each of USCIS's exemption claims—which are analyzed one-by-one, below—Mezerhane also argues generally that USCIS's affidavits lacked sufficient detail to justify withholding, and that USCIS failed to provide an adequate explanation for why additional portions of documents need not be disclosed as segregable, non-exempt information. But the Court's in camera review eliminated any doubt on these issues: the disputed documents are all described accurately and sufficiently in the agency's Vaughn index, in its briefs, and in its supporting affidavits. Thus, Mezerhane's arguments about insufficient detail and about improper segregability analyses are rejected.

release of the requested information might create a risk of circumvention of the law.'" Blackwell v. FBI, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting Mayer Brown LLP v. IRS, 562 F.3d 1190, 1194 (D.C. Cir. 2009)); see also id. ("[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk.") (internal quotation marks omitted).

USCIS clears this "relatively low bar" for all of the records it has withheld under Exemption 7(E), because USCIS has "demonstrate[d] logically how the release of the requested information might create a risk of circumvention of the law." Id. For example, USCIS withheld several pages of printouts from "The Enforcement Communications System," also known as the "TECS II" database. The TECS II database contains law enforcement data "from a variety of federal, state and local sources," including "names, aliases, dates of birth, addresses, physical descriptions, various identification[] number[s], details and circumstances of search, arrest or seizures," and so on. Def.'s Mot. for Summ. J. ("Def.'s MSJ") [ECF No. 16] at 13.

USCIS's representations, and this Court's own in camera review, confirm that this data "was compiled for law enforcement purposes," and that its disclosure would risk revealing "techniques and procedures for law enforcement investigations or prosecutions," 5 U.S.C. § 552(b)(7)(E). Specifically, it could create the "chance" of a "risk" of circumvention of the law, because it could enlighten asylum applicants with criminal backgrounds about what sort of law enforcement information (from which databases) is consulted by USCIS during adjudication of a pending asylum application—and, of course, by logical inference, what sort of information is not consulted. Not surprisingly, several courts in this district have held that printouts from the TECS

4

II database are properly withheld under FOIA Exemption 7(E). See, e.g., Strunk v. U.S. Dep't of State, 905 F. Supp. 2d 142, 148 (D.D.C. 2012) ("The CBP thus demonstrates that its decision to withhold the TECS-related information under Exemption 7(E) is proper."); Skinner v. U.S. Dep't of Justice, 806 F. Supp. 2d 105, 116 (D.D.C. 2011) ("USCIS properly has redacted from the TECS screen printout information pertaining to the techniques, procedures and guidelines for action in an ongoing criminal law enforcement operation.").

The same is true for the other information USCIS withholds under Exemption 7(E), which includes, for example, records of USCIS queries of the Interagency Border Inspection System ("IBIS"), see, e.g., Vaughn Index [ECF No. 16-4] Nos. 297-98, 321, and other information that might reveal the methods by which USCIS cooperates and shares information with the Federal Bureau of Investigation ("FBI") in adjudicating asylum applications, see, e.g., id. No. 245. Given the deferential standard applied by the D.C. Circuit for agency withholding under Exemption 7(E), and the in camera review that confirmed the accuracy of the agency's description of the relevant documents, the Court will not second-guess USCIS's concerns about the potential risks of releasing this information.

In response, Mezerhane hardly disputes USCIS's factual assertions and, instead, makes a series of legal arguments. None are persuasive. She begins with an appeal to (out-of-circuit, district court) authority: Gluckman v. U.S. Dep't of Labor, 2013 WL 6184957 (E.D. Va. Nov. 26, 2013), which she reads to stand for the proposition that "[a]n agency withholding records for law enforcement purposes must have a law enforcement mandate." Pl.'s MSJ at 21 (internal quotation marks omitted). USCIS, argues Mezerhane, "is not principally or even tangentially engaged in law enforcement activity"; instead, it "refers immigration enforcement matters to Immigration and Customs Enforcement." Id. at 22. Even assuming Mezerhane has her facts

5

right, this argument overreads Gluckman and, more importantly, finds no basis in FOIA's text. Exemption 7(E) applies to all "records or information compiled for law enforcement purposes," 5 U.S.C. § 552(b)(7)—making no reference to, distinction between, or limitation on the sort of agency currently in custody of the document. Mezerhane does not cite, and the Court has not found, any D.C. Circuit authority for such a distinction. Furthermore, even taking Gluckman on its own terms, USCIS has demonstrated "that the records at issue are involved with the enforcement of a statute or regulation within its authority and that the records were compiled for adjudicative or enforcement purposes," Gluckman, 2013 WL 6184957, at *6, and that is enough. Finally, the Court's in camera review has confirmed that nearly all of the information in question involves USCIS's cooperative relationship with the FBI: the paradigmatic example of a federal agency with a law enforcement mandate.

Mezerhane also argues repeatedly that because she "is a devoted mother of four, without a single criminal conviction anywhere in the world," Pl.'s MSJ at 23, release of the disputed information would not "enable her to evade the law." Id. But the applicability of Exemption 7(E) bears no relationship to the identity of the FOIA requester. See, e.g., Nat'l Archives & Records Admin. v. Favish, 541 U.S. 157, 172 (2004) (applicability of FOIA exemptions "does not depend on the identity of the requester"). What matters is the risk of improper disclosure of law enforcement techniques and procedures, regardless of who wants the information. Mezerhane's law-abiding character is admirable, but irrelevant.

Finally, Mezerhane claims that "USCIS has already made publicly available much of the information about the law enforcement techniques it now seeks to withhold," Pl.'s MSJ at 24, citing some training manuals and guidance documents that USCIS has published online. But "[t]here is no principle . . . that requires an agency to release all details concerning [its]

6

techniques simply because some aspects of them are known to the public." Barnard v. DHS, 598 F. Supp. 2d 1, 23 (D.D.C. 2009); see also Miller v. U.S. Dep't of Justice, 562 F. Supp. 2d 82, 124 (D.D.C. 2008) ("Although it is common knowledge that law enforcement agencies develop psychological profiles, the exact nature and type of information used to develop these profiles . . . warrants protection . . . .") (internal quotation marks omitted); Blanton v. U.S. Dep't of Justice, 63 F. Supp. 2d. 35, 50 (D.D.C. 1999) ("While the techniques themselves have already been identified by the FBI, the documents in question involve the manner and circumstances of the various techniques that are not generally known to the public.") (internal quotation marks omitted). USCIS properly withheld this information under Exemption 7(E), and the Court will grant summary judgment in favor of USCIS on this exemption claim.

## II. USCIS Properly Invoked FOIA Exemptions 6 and 7(C) to Protect Third-Party Privacy Interests

USCIS invoked FOIA Exemptions 6 and 7(C) to protect the privacy interests of third-parties. Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). Exemption 7(C) excludes "records of information compiled for law enforcement purposes . . . to the extent that production of such law enforcement records or information . . . could reasonably be expected to constitute an unwarranted invasion of personal privacy." Id. § 552(b)(7)(C). Under both provisions, agencies and reviewing courts must "balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information." Davis v. U.S. Dep't of Justice, 968 F.2d 1276, 1281 (D.C. Cir. 1992). But because "Exemption 7(C)'s privacy language is broader than the comparable language in Exemption 6 in two respects," see U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press, 489 U.S. 749, 756 (1989), Exemption 7(C) "establishes a lower bar for withholding

material." ACLU v. U.S. Dep't of Justice, 655 F.3d 1, 6 (D.C. Cir. 2011) (citing U.S. Dep't of Defense v. FLRA, 510 U.S. 487, 496 n.6 (1994)). Thus, courts in this Circuit generally consider whether agencies have met the requirements of Exemption 7(C); if they have, there is no need for further analysis.[2] See, e.g., ACLU, 655 F.3d at 6.

Mezerhane does not dispute USCIS's assertions that legitimate third-party privacy interests are implicated by the withheld information. Her only argument for the release of this information is that disclosure would serve the public interest, by shedding light on several varieties of potential agency misconduct in the processing of her asylum application (and those of her family members). She claims that "disclosure would confirm or refute whether [USCIS] has breached its own regulations, Congressional mandates, or its duties under International Human Rights law in its processing, adjudication, and handling of applications for asylum." Pl.'s MSJ at 14.[3]

USCIS's response falls flat: it simply insists repeatedly that Mezerhane's "complaint about her immigration issue is irrelevant," and that "[t]his case turns on whether USCIS has properly responded to Plaintiff's FOIA Request"—"[n]othing more." Def.'s Opp'n & Reply [ECF No. 20] at 2. That is mostly true, but entirely unhelpful. The Court cannot decide whether "USCIS has properly responded to Plaintiff's FOIA Request" without also considering Mezerhane's assertions that disclosure would serve a significant public interest by revealing

---

[2] Just as with Exemption 7(E), for Exemption 7(C) to apply, the requested records must have been compiled for law enforcement purposes. Jefferson v. U.S. Dep't of Justice, Office of Prof'l Responsibility, 284 F.3d 172, 176-77 (D.C. Cir. 2002). As discussed above in upholding USCIS's reliance on Exemption 7(E), Mezerhane's arguments that some of the withheld records were not "compiled for law enforcement purposes" are unpersuasive. See supra Section I.

[3] Specifically, Mezerhane suggests (with varying degrees of detail) that USCIS may have unreasonably delayed notifying her that she had been granted asylum, in violation of the Administrative Procedure Act; that USCIS may have violated its own regulations by conducting additional background checks after a decision had been made to grant her asylum; that USCIS may have violated its own regulations by disclosing confidential information about Mezerhane's asylum application to third parties; and that USCIS may have violated its own regulations by placing too much weight on improper and non-credible third-party sources. See generally Pl.'s MSJ at 15-20.

8

agency misconduct. See, e.g., Roth v. U.S. Dep't of Justice, 642 F.3d 1161, 1174 (D.C. Cir. 2011) ("To determine whether disclosure could reasonably be expected to constitute an unwarranted invasion of personal privacy for purposes of Exemption 7(C), we must balance the privacy interests that would be compromised by disclosure against the public interest in release of the requested information.") (internal quotation marks omitted); see also Favish, 541 U.S. at 173 ("[T]he justification most likely to satisfy Exemption 7(C)'s public interest requirement is that the information is necessary to show the investigative agency or other responsible officials acted negligently or otherwise improperly in the performance of their duties."). If, in fact, disclosure would reveal significant agency misconduct, it might very well be true that the public interest in disclosure outweighs the privacy interests at stake and, thus, that USCIS improperly invoked Exemptions 6 and 7(C).

But in the end, the Court's in camera review gets USCIS off the hook, as it confirmed USCIS's (otherwise, mostly conclusory) representations about the minimal public interest in the withheld information, and disproved Mezerhane's assertions that disclosure would reveal agency misconduct. Quite simply, the withheld information neither confirms nor refutes Mezerhane's allegations of misconduct. Virtually all of the information withheld under this exemption consists of the names (or other identifying information) of third parties, carefully redacted from documents that were otherwise disclosed (or properly withheld under other FOIA exemptions). For example, USCIS consistently redacts the names of individuals (other than the plaintiff) who appeared in law enforcement background check searches associated with processing Mezerhane's asylum application. See, e.g., Vaughn Index Nos. 258-69, 299, 300, 301. Disclosure of the names of these individuals would not get Mezerhane any answers about possible agency misconduct, and would infringe upon the privacy interests of third parties not before the Court.

See, e.g., Martin v. Dep't of Justice, 488 F.3d 446, 457 (D.C. Cir. 2007) ("[T]hird parties who may be mentioned in investigatory files . . . have an obvious and substantial privacy interest in their information.") (alteration in original) (internal quotation marks omitted). Hence, the Court finds that USCIS properly invoked Exemptions 6 and 7(C) here. See, e.g., SafeCard Servs., Inc. v. SEC, 926 F.2d 1197, 1206 (D.C. Cir. 1991) ("We now hold categorically that, unless access to the names and addresses of private individuals appearing in files within the ambit of Exemption 7(C) is necessary in order to confirm or refute compelling evidence that the agency is engaged in illegal activity, such information is exempt from disclosure."); see also Davis, 968 F.2d at 1282 ("[E]ven if a particular privacy interest is minor, nondisclosure remains justified where . . . the public interest in disclosure is virtually nonexistent.").

One point warrants additional clarity. In rejecting Mezerhane's arguments about a public interest in disclosure, the Court need not (and does not) decide whether Mezerhane has plausibly alleged negligent or intentional misconduct by USCIS in the processing of her and her family's asylum applications (though it will return to a related issue below, see infra Section III). The Court concludes only that, whether or not Mezerhane's theories of misconduct are plausible, the information USCIS has withheld under Exemptions 6 and 7(C) would do nothing to confirm or refute them. Accordingly, that information—which clearly implicates the privacy interests of third parties—remains exempt.

### III. Summary Judgment on USCIS's Deliberative-Process Privilege Claims Under Exemption 5 Is Not Appropriate at This Time

Although USCIS asserted that Exemption 5 protected much of the disputed information, most of those records are also withheld under Exemptions 6, 7(C), or 7(E)—claims the Court has now decided in USCIS's favor. For those documents that overlap, the Court need not consider the additional applicability of Exemption 5—if a document is properly withheld under any FOIA

exemption, the inquiry is over. What remains are only the two documents (totaling five pages) that are withheld, in whole or in part, based only on Exemption 5. See Vaughn Index Nos. 1-4, 246.

FOIA Exemption 5 protects from disclosure "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). "To qualify, a document must thus satisfy two conditions: its source must be a Government agency, and it must fall within the ambit of a privilege against discovery under judicial standards that would govern litigation against the agency that holds it." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 8 (2001). Here, there is no dispute that the disputed records all come from USCIS, a government agency. And USCIS invokes only one litigation privilege: the deliberative-process privilege.

The deliberative-process privilege is "[a] privilege unique to the government." Coastal States Gas Corp. v. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). To decide whether a document falls within the privilege, courts in this Circuit first "look to whether the document is 'predecisional,'" that is, "whether it was generated before the adoption of an agency policy." Id. Next, a reviewing court asks "whether the document is 'deliberative,'" that is, "whether it reflects the give-and-take of the consultative process." Id. The deliberative-process privilege "thus covers recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." Id.

The deliberative-process privilege "has a number of purposes: it serves to assure that subordinates within an agency will feel free to provide the decisionmaker with their uninhibited opinions and recommendations without fear of later being subject to public ridicule or criticism;

11

to protect against premature disclosure of proposed policies before they have been finally formulated or adopted; and to protect against confusing the issues and misleading the public by dissemination of documents suggesting reasons and rationales for a course of action which were not in fact the ultimate reasons for the agency's action." Coastal States, 617 F.2d at 866.

As explained below, on the present record the Court cannot determine whether these documents are covered by the deliberative-process privilege and, thus, FOIA Exemption 5. Although the documents, on their face, appear to be both pre-decisional and deliberative, other evidence in the record undermines that conclusion.

### A. The withheld records appear to be pre-decisional and deliberative.

The two documents in question are described in some detail on USCIS's Vaughn index. The first is a four-page "Asylum Officer Assessment" dated February 11, 2013, which USCIS withheld almost in its entirety. USCIS explains that "[t]he purpose of the assessment is to document the essential facts in support of the applicant's asylum application, and the Asylum Officer's analysis and recommendations." Vaughn Index Nos. 1-4, Description. USCIS argues that this document "is pre-decisional because it predates USCIS's decision on Plaintiff's asylum application," id., which USCIS claims was not finalized until November 14, 2013, when an "Asylum Approval" letter was mailed to Mezerhane, see Ex. J to Pl.'s MSJ [ECF No. 18-5]. And USCIS argues that this document is "deliberative because the options provided and selected by the Asylum Officer are selective in nature and highlight certain portions of the Plaintiff's record that were deemed pertinent to the USCIS Officer's ultimate recommendation on whether to approve or deny the Plaintiff's application." Vaughn Index Nos. 1-4, Description. The Court's in camera review confirms USCIS's representations: the document appears to be a non-binding

recommendation from an Asylum Officer to his superior about whether (and why) the Asylum Officer believes Mezerhane's asylum application should be granted or denied.

The other document is a one-page "Quality Assurance Referral Sheet," dated November 19, 2012. It appears to be a check-list of circumstances warranting additional review from "HQ"—presumably meaning "headquarters"—"prior to service of any decision" to the applicant. Such circumstances include, for example, asylum applications implicating national security concerns, applications submitted by foreign diplomats, applications likely to generate unusual media attention, and so on. The document was produced to Mezerhane, but all of the check-boxes were redacted (in such a way that Mezerhane cannot see which boxes, if any, were checked in connection with her asylum application). USCIS argues that release of this pre-decisional, deliberative information "would chill and inhibit USCIS Officers from making a through record of their deliberations on applications for immigration benefits." Id., No. 246, Description. Once again, the Court's in camera review confirms USCIS's representations about the document, and its description in the Vaughn index.

### B. Other evidence suggests that the withheld records may not be pre-decisional.

Mezerhane filed her asylum application on August 11, 2010. According to USCIS, the decision to grant Mezerhane's asylum application was not made until November 14, 2013—over three years later.[4] According to USCIS, the decision became final when it mailed a letter to Mezerhane notifying her of the decision. Mezerhane, however, puts forth several pieces of evidence that call USCIS's explanation into some doubt. Mezerhane's theory is that the decision

---

[4] The Immigration and Nationality Act sets a presumptive 180-day maximum for the time period to adjudicate an asylum application. See 8 U.S.C. 1158(d)(5)(A)(iii) ("[I]n the absence of exceptional circumstances, final administrative adjudication of the asylum application, not including administrative appeal, shall be completed within 180 days after the date an application is filed."). At least in these proceedings, USCIS has not taken a position on whether Mezerhane's application presented "exceptional circumstances" justifying delay.

13

was made as early as September 2010, but that USCIS withheld this information from her for three years, then notified her of a three-year-old decision in the November 14, 2013 letter.

Mezerhane's first hint that something might have gone awry with the processing of her asylum application came on August 7, 2013, when her husband, Roberto Schnapp, visited a USCIS field office to inquire about his long-pending application for an "Advance Parole Travel Document," which is the document required to travel abroad with a pending asylum application. See 8 C.F.R. § 208.8(a). Schnapp was a "derivative beneficiary" of his wife's application, so his asylum status was directly linked to hers. See 8 U.S.C. § 1158(b)(3)(A). When Schnapp asked about his travel documents, USCIS officials told him that the "Advance Parole Travel Document" was not the proper document for him to seek—because he had already been granted asylum as a derivative beneficiary of his wife's application. See Roberto Schnapp Aff. ¶ 6, Ex. B to Pl.'s MSJ [ECF No. 18-5]. The USCIS officials showed Schnapp his case file, which indicated that his Advance Parole Travel Document should instead have been processed as a request for another form, called a "Refugee Travel Document." Importantly, only applicants who already hold asylum status are eligible for a Refugee Travel Document. See 8 U.S.C. § 1158(c)(1)(C).

Schnapp's account of this conversation is corroborated by documentary evidence in the record, in the form of a copy of the form he submitted to USCIS as part of his request for an Advance Parole Travel Document. Schnapp explains how the USCIS officer showed him this document under confusing circumstances:

> Officer Marenco then showed me a copy of the Advance Parole application form filed in my case. It was a copy of the form my attorney had filed, but with one major difference: the form my attorney submitted checked the box "d," indicating that I was applying for advance parole to allow me to return to the United States after temporary foreign travel; the form that Officer Marenco showed me had the box "b" checked in red marker, indicating that "I now hold U.S. refugee or asylee

14

> status, and I am applying for a Refugee Travel Document." I told her that neither I nor my lawyers had marked my application in red pen, or marked the box that I held refugee or asylee status. I even showed her a copy of my original application, which clearly showed that box "d" was marked, and there was no use of red pen anywhere. It was apparent to me that this mark was made internally by USCIS. I asked if I could make a copy of the document for my own records, but she denied my request.

Schnapp Aff. ¶ 7. This document—later obtained by Schnapp in a separate FOIA request—is marked consistently with Schnapp's story: boxes (b) and (d) are both checked. See Ex. C to Pl.'s MSJ.

Next, on October 30, 2013, a staff member at the USCIS Ombudsman's office—who had apparently been in contact with Mezerhane's attorney, Sandra Grossman, due to the significant delays in the family's asylum applications and travel document requests—called to explain that the Mezerhane family should not have filed for an Advance Parole Travel Document, because they "already held asylum status." See Sandra Grossman Aff. ¶ 9(h) [ECF No. 18-4]; see also Oct. 31, 2013 Email from Sandra Grossman to USCIS Ombudsman Officer, Ex. D to Pl.'s MSJ. And to confirm, this USCIS official apparently located Mezerhane's case in the USCIS Refugee Asylum and Parole System database, which indicated that Mezerhane's application for asylum had been granted years ago, in September of 2010. See Sandra Grossman Aff. ¶ 9(h).

Finally, on February 17, 2014, Mezerhane and her family re-entered the United States after a brief trip to the Bahamas (each using a Refugee Travel Document, issued in January 2014, after all family members had been notified of their being granted asylum). At customs, a DHS Customs and Border Protection Officer pulled up the family's file and commented that Mezerhane and her family were described in DHS records as "asylees since 2010." See Mezerhane Aff. ¶¶ 6, 7; Schnapp Aff. ¶ 11.

15

The government makes two arguments in response to Mezerhane's evidence. Neither one is persuasive. First, the government claims that all of the key evidence is inadmissible hearsay that the Court cannot consider at the summary-judgment stage. See, e.g., U.S. ex rel. Davis v. District of Columbia, 2014 WL 1273608, at *6 (D.D.C. Mar. 31, 2014) ("To support summary judgment, evidence must generally be capable of being offered at trial in admissible form.") (citing Fed. R. Civ. P. 56(c)(2)). This argument is meritless: the key out-of-court statements are from USCIS and DHS employees, acting squarely within the scope of their employment, speaking on issues they are authorized to speak about. See Fed. R. Evid. 801(d)(2) (excepting from the hearsay rule any statement, offered against a party, if "made by a person whom the party authorized to make a statement on the subject," or if "made by the party's agent or employee on a matter within the scope of that relationship"). These statements are the admissions of a party-opponent—not hearsay.

USCIS also relies on 8 C.F.R. § 208.19, claiming that it stands for the proposition that "a determination to grant or deny becomes a final determination on the date that USCIS signs a decision letter notifying the applicant of USCIS's decision." Def.'s Opp'n & Reply at 4. But the regulation says no such thing—it simply requires that "[t]he decision of an asylum officer to grant or to deny asylum . . . shall be communicated in writing to the applicant." The regulation says nothing of timing or finality. And, in fact, Mezerhane's theory is that USCIS violated this regulation (at least its spirit, if not its letter), by waiting over three years to mail her a notice letter confirming that her asylum application had been granted.

To be sure, USCIS does offer a declaration from the Director of the Miami Asylum Office, who asserts that the final decision in Mezerhane's case was not made until November 14, 2013. But, once again, his only support for that (conclusory) assertion comes from the notice

16

letter. See Decl. of Varsenik Papazian [ECF No. 20-2] ¶ 20 ("The final determination to grant asylum to Ms. Mezerhane . . . was issued on November 14, 2013, as reflected in the approval letter."). So this is just another version of the argument that the date of the notice letter is controlling. See id. ¶ 10 ("The proposed decisions of Asylum Officers to grant or deny asylum do not become a final determination until the [Supervisory Asylum Officer] . . . signs the decision letter, in accordance with 8 C.F.R. § 208.19."). The fact that USCIS also included this argument in a signed declaration does not make it any more persuasive, as a legal matter.

### C. Because of the factual dispute over whether the documents are pre-decisional, summary judgment is inappropriate on this record.

As should be clear from the previous discussion, the parties dispute the date on which Mezerhane's application for asylum was granted. There is evidence to support both parties' positions: statements from USCIS employees corroborate Mezerhane's assertion that the decision was made as early as September 2010, yet USCIS documents from early 2013 are written as if a final decision had not yet been made, see Vaughn Index Nos. 1-4 (Asylum Officer's recommendation, dated February 11, 2013). Documents generated after a final decision are generally not "pre-decisional" for purposes of the deliberative-process privilege, so this issue could very well be outcome-determinative (for these five pages of documents).

To be sure, Mezerhane's evidence is not immune to skepticism; it is primarily based on unverifiable accounts of the plaintiff, her husband, and her attorney's recollections of conversations with (sometimes unnamed) government officials. For that reason, one might conclude that Mezerhane's evidence is not reliable, not credible, or both. Relying on this evidence is also in some tension with case law that instructs a district judge to treat the plaintiff's own self-serving affidavits with some skepticism—even at the summary judgment stage. See,

e.g., Brooks v. Kerry, 2014 WL 1285948, at *8 (D.D.C. March 31, 2014) (noting that, standing alone, "self-serving testimony does not create genuine issues of material fact").

Even so, at this stage, Mezerhane's evidence stands virtually unchallenged—USCIS does not deny that the conversations took place as remembered by the various affiants, and all of USCIS's legal arguments for ignoring this evidence have been rejected. And Mr. Schnapp's account is consistent with tangible, documentary evidence in the record. See Ex. E to Pl.'s MSJ. Furthermore, the fact that the plaintiff's husband and the plaintiff's attorney have offered sworn affidavits—describing separate events from those appearing in the plaintiff's affidavit—also distinguishes this case from those in which a plaintiff opposes summary judgment with nothing more than the plaintiff's own conclusory, self-serving statements.

Therefore, construing all this evidence in the light most favorable to the non-moving party, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), mindful that the U.S. Supreme Court has "consistently stated that FOIA exemptions are to be narrowly construed," U.S. Dep't of Justice v. Julian, 486 U.S. 1, 8 (1988), and because "the burden is on the agency to sustain its action," 5 U.S.C. § 552(a)(4)(B), Mezerhane has done just enough to defeat USCIS's current motion, based upon the unusual facts presented by this case. The bottom line is this: on the present record, one can come to more than one conclusion about when USCIS made a decision on Mezerhane's asylum application and, in turn, whether these documents are predecisional, and protected by the deliberative-process privilege. Hence, both parties' motions for summary judgment on the Exemption 5 issue will be denied at this time.

With the benefit of this opinion, and mindful of the fact that only five pages remain in dispute, the Court is hopeful that the parties will be able to come to an agreement to resolve this matter. In case that hope should prove unfounded, the Court will set a schedule for supplemental

factual submissions, and the filing of short legal memoranda from each side. Upon review of that additional material, the Court will make a final determination about whether the government has carried its burden to sustain its exemption claims for these last five pages.

## **CONCLUSION**

For the reasons set forth above, [16] USCIS's motion for summary judgment is granted in part and denied in part, and [18] plaintiff's cross-motion for summary judgment is denied in its entirety. A separate Order has issued on this date.

Dated: September 9, 2014

/s/
JOHN D. BATES
United States District Judge