**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **NELSON JOSE MEZERHANE GOSEN,**<br><br>    Plaintiff,<br><br>    v.<br><br>**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,**<br><br>    Defendant. | Civil Action No. 13-1091 (JDB) |
| **MARIA ANDREA MEZERHANE DE SCHNAPP,**<br><br>    Plaintiff,<br><br>    v.<br><br>**UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,**<br><br>    Defendant. | Civil Action No. 13-1461 (JDB) |

**MEMORANDUM OPINION[1]**

Nelson Jose Mezerhane Gosen and his daughter Maria Andrea Mezerhane de Schnapp seek disclosure of agency records related to their applications for asylum under the Freedom of Information Act. The Act requires federal agencies to release all records responsive to proper FOIA requests unless the record falls within one of nine exemptions outlined in 5 U.S.C. § 552(b). Mezerhane Gosen and Mezerhane de Schnapp filed separate, but similar, FOIA actions against

---

[1] The Court will enter this Memorandum Opinion in each of the two related—but unconsolidated—cases listed in the caption: Mezerhane Gosen v. U.S. Citizenship and Immigration Services, No. 13–1091 (hereinafter "Gosen"), and Mezerhane de Schnapp v. U.S. Citizenship and Immigration Services, No. 13–1461 (hereinafter "Schnapp").

1

United States Citizenship and Immigration Services challenging the government's decision to withhold a number of requested documents under various FOIA exemptions.

After a previous round of cross-motions for summary judgment, only a small set of documents, comprising five pages of agency records in Schnapp, see Schnapp Vaughn Index [ECF No. 16-4] Bates Nos. 1–4, 246, and twenty-two pages of records in Gosen, see Gosen Vaughn Index [ECF No. 17-7] Bates Nos. 1–9, 28–29, 153–157, 257–62, remain in dispute. [2] See Mezerhane Gosen v. U.S. Citizenship and Immigration Services, --- F. Supp. 3d ---, 2014 WL 6809183, at *9 (D.D.C. Dec. 4, 2014); Mezerhane de Schnapp v. U.S. Citizenship and Immigration Services, 67 F. Supp. 3d 95, 99 (D.D.C. 2014). Now before the Court are the parties' renewed cross-motions for summary judgment. For the reasons explained below, this Court finds that the remaining pages in dispute are generally protected under FOIA Exemption 5 by the deliberative-process privilege—but that there remains reasonably segregable non-exempt material in both cases. Thus, the Court will largely deny the plaintiffs' cross-motions for summary judgment, but grant in part Gosen's motion to the extent that it requested the release of non-exempt segregable portions of the remaining documents. The Court will grant in part and deny in part the government's motions for summary judgment and order the government to release reasonably segregable material from the remaining documents in each case.[3]

---

[2] In Gosen, fourteen of the twenty-two remaining pages withheld under Exemption 5 are already being withheld under other FOIA exemptions. As this Court previously explained, "[f]or documents that overlap, the Court need not consider the additional applicability of Exemption 5—if a document is properly withheld under any FOIA exemption, the inquiry is over." See Schnapp, 67 F. Supp. 3d at 104. Moreover, another court in this district has already found that none of those fourteen documents contain reasonably segregable information. See Gosen, 2014 WL 6809183, at *3 n.3.

[3] The Mezerhanes also filed motions for leave to file supplemental evidence. See Gosen's Mot. for Leave to File Supp. Evidence [ECF No. 44] at 1; Schnapp's Mot. for Leave to File Supp. Evidence [ECF No. 37] at 1. The Court will grant the Mezerhanes' motions and consider all evidence in the record, including the government's supplemental evidence filed in response to the plaintiffs' supplemental evidence. See, e.g., Supp. Decl. of Elizabeth Posont for Gosen [ECF No. 45–1]; Supp. Decl. of Elizabeth Posont for Schnapp [ECF No. 38–1].

**BACKGROUND**

After Mezerhane Gosen, co-founder of Venezuela's last independent television station, refused to shut down programming critical of the Chavez regime, the family feared political persecution. Gosen's Compl. [ECF No. 1] ¶ 6; Schnapp's Compl. [ECF No. 1] ¶ 6.  As a result, the Mezerhanes applied for asylum in the United States in August 2010.  They then sat in "immigration limbo" for over three years.  Schnapp's Mot. for Summ. J. [ECF No. 18-1] at 7. While waiting, the Mezerhanes experienced a few curious encounters with Immigration Services, in which agency employees seemed to believe that the Mezerhanes had already been granted asylum.  Id. at 12.  But come March 2013, the Mezerhanes still had not heard anything from Immigration Services.  Mezerhane Gosen then decided to submit a FOIA request for any and all documents related to his pending asylum claim.  Gosen's Compl. ¶ 7.  Soon after, Mezerhane de Schnapp submitted her own request for documents related to her asylum claim.  Schnapp's Compl. ¶ 7.

Based on their strange encounters with Immigration Services, the Mezerhanes believed that the government had made the final decision to grant them asylum back in September 2010—but had failed to notify them as required, and deviated from proper procedure through an ad hoc reconsideration of their applications.  See Gosen's Mot. for Summ. J. [ECF No. 20–1] at 8–9. Skeptical of the ongoing application process, the Mezerhanes filed FOIA actions challenging the government's decision to withhold certain documents in response to their FOIA requests.  A few months later, in November 2013, Immigration Services notified the Mezerhanes that they had been granted asylum.  See Ex. L to Gosen's Mot. for Summ. J. [ECF No. 20–5] at 73; Def.'s Schnapp Mot. for Summ. J. [ECF No. 16] at 2 n.1.  But the Mezerhanes nonetheless continued to seek access to the withheld documents.

Last year, this Court and another court in the district granted in substantial part the government's two motions for summary judgment because the government had properly withheld most of the documents under FOIA Exemptions 6, 7(C), and 7(E).  See Gosen, 2014 WL 6809183, at *1; Schnapp, 67 F. Supp. 3d at 99.  But in each action, the Court denied summary judgment as to a small set of documents that were withheld under the FOIA Exemption 5 deliberative-process privilege.  See Gosen, 2014 WL 6809183, at *8; Schnapp, 67 F. Supp. 3d at 99.  The parties have now filed renewed cross-motions for summary judgment regarding whether the deliberative-process privilege protects those remaining documents from disclosure.

Although the Mezerhanes seek disclosure of different documents, this Court analyzes their FOIA actions together.  Their actions are "substantially identical" and make the "exact same legal arguments."  Gosen, 2014 WL 6809183, at *2.  Moreover, the Mezerhanes rely on the same evidence to argue that the agency granted them asylum back in 2010.  Compare Gosen, 2014 WL 6809183, at *8–9, with Schnapp, 67 F. Supp. 3d at 106–07.  Mezerhane de Schnapp's asylum application depended on her father's claim of political persecution, so evidence of her asylum status at a given time is used as evidence of her father's asylum status at that time, and vice versa.  See Gosen, 2014 WL 6809183, at *9 (recognizing the Mezerhane de Schnapp family's asylum applications rely on Mezerhane Gosen's claim of political persecution).  Therefore, it is appropriate for this Court to assess the two FOIA actions together.

## STANDARD OF REVIEW

"FOIA cases typically and appropriately are decided on motions for summary judgment."  Defenders of Wildlife v. U.S. Border Patrol, 623 F. Supp. 2d 83, 87 (D.D.C. 2009).  To prevail on summary judgment, a party must show that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.  In assessing each party's

motion, "underlying facts and inferences are analyzed in the light most favorable to the non-moving party." N.S. ex rel. Stein v. District of Columbia, 709 F. Supp. 2d 57, 65 (D.D.C. 2010).

In the FOIA context, an agency merits summary judgment if it proves that "requested material falls within a FOIA exemption." Petroleum Info. Corp. v. U.S. Dep't of Interior, 976 F.2d 1429, 1433 (D.C. Cir. 1992). But summary judgment is appropriate for the plaintiff "[w]hen an agency seeks to protect material which, even on the agency's version of the facts, falls outside the proffered exemption." Id.

A grant of summary judgment may be based solely on an agency's supporting affidavits or declarations so long as those documents describe the requested material with "reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." Military Audit Project v. Casey, 656 F.2d 724, 738 (D.C. Cir. 1981). "Agency affidavits enjoy a presumption of good faith" and a plaintiff "must point to evidence sufficient to put the Agency's good faith into doubt." Ground Saucer Watch, Inc. v. CIA, 692 F.2d 770, 771 (D.C. Cir. 1981).

## ANALYSIS

I. **EXEMPTION 5**

The government contends that the pages remaining in dispute are exempt from disclosure under FOIA Exemption 5, which applies to "inter-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). It "incorporates the traditional privileges that the Government could assert in civil litigation against a private litigant," such as "the deliberative process privilege," and "excludes these privileged documents from FOIA's reach." Loving v. Dep't of Defense, 550 F.3d 32, 37 (D.C. Cir. 2008) (internal quotation marks omitted). The government has invoked the deliberative-process

privilege, which "protects agency documents that are both predecisional and deliberative." Judicial Watch, Inc. v. FDA, 449 F.3d 141, 151 (D.C. Cir. 2006).

Agency documents are "predecisional" if they are "'prepared in order to assist an agency decisionmaker in arriving at his decision,' rather than to support a decision already made." Petroleum Info. Corp., 976 F.2d at 1434 (quoting Renegotiation Bd. v. Grumman Aircraft, 421 U.S. 168, 184 (1975)). And documents are "deliberative" if they "reflect[] the give-and-take of the consultative process." Coastal States Gas Corp. v. U.S. Dep't of Energy, 617 F.2d 854, 866 (D.C. Cir. 1980). Thus, the deliberative-process privilege generally applies to "advisory opinions, recommendations, and deliberations comprising part of a process by which governmental decisions and policies are formulated." Taxation with Representation Fund v. IRS, 646 F.2d 666, 677 (D.C. Cir. 1981).

This Court and another district court have already noted, and the Mezerhanes now concede, that the requested documents are deliberative. See Schnapp, 67 F. Supp. 3d at 107; Gosen 2014 WL 6809183, at *8; Schnapp's Mem. in Opp. to Def.'s Renewed Mot. for Summ. J. [ECF No. 31] at 2. The only question before this Court, then, is whether the documents are also predecisional. The Court finds that they are: the government drafted the requested documents before the official process required to grant asylum was complete. And no matter what the government did or did not decide in 2010, the contents of the remaining pages served the deliberative process for a future decision.

All parties agree that the central issue in both actions is when the government made its final decision to grant the Mezerhanes' asylum applications. See Def.'s Gosen Renewed Mot. for Summ. J. at 1; Gosen's Renewed Mot. for Summ. J. [ECF No. 37] at 3; Schnapp's Mem. in Opp. to Def.'s Renewed Mot. for Summ. J. at 2. The timing of the final decision is important because

6

courts have held that documents are predecisional when "generated before the adoption of an agency policy." Coastal States, 617 F.2d at 866; cf. Elec. Frontier Found. v. U.S. Dep't of Justice, 739 F.3d 1, 9–10 (D.C. Cir. 2014) (finding that the deliberative process privilege "does not protect final decisions or authoritative statements on agency policy").[4] The Mezerhanes contend that the government made a final determination to grant asylum in September 2010 and that all disputed documents postdate that decision. See Gosen's Renewed Mot. for Summ. J. at 2; Schnapp's Mem. in Opp. to Def.'s Renewed Mot. for Summ. J. at 2. But the government counters that no final decision was made until November 2013 and that, therefore, all disputed documents are predecisional. See Def.'s Gosen Renewed Mot. for Summ. J. at 1.

Based on the evidence before the Court, the Mezerhanes have not raised a genuine issue of material fact suggesting the final decision to grant asylum was made before November 2013. The agency's detailed account of the asylum approval process—and the process for the Mezerhanes' applications in particular—demonstrate that no final decisions were made until that time. According to the agency, the Asylum Office prepares a "Quality Assurance Referral Packet" for each applicant, which includes a Quality Assurance Referral Sheet, the Officer's recommended decision, and supporting documentation. See 2d Supp. Decl. of Varsenik Papazian in Gosen [ECF No. 39–2] ¶¶ 11, 12. Notably, such assessments can be re-written to reflect information learned later through additional vetting. 2d Supp. Papazian Gosen Decl. ¶ 12. After packets are prepared, they are reviewed by a Supervisory Asylum Officer. 2d Supp. Papazian Gosen Decl. ¶ 13. And there are also certain types of cases—including the Mezerhanes'—that must be reviewed and

---

[4] Courts focus on when a "final decision" to adopt a particular agency policy is made because they do not want an agency to "develop a body of secret law, used by it in the discharge of its regulatory duties and in its dealings with the public, but hidden behind a veil of privilege because it is not designated as formal, binding, or final." Coastal States, 617 F.2d at 867 (internal quotations omitted). Here, there is no real fear of the government using the deliberative process privilege to hide a secret body of law since there is no policy effect of granting someone asylum until they know that they have been granted asylum. Thus, the primary concern that motivates courts to assess when an agency made a "final" decision or truly "adopted" a policy is simply not an issue in this case.

approved by the Headquarters Asylum Division. Before such cases can be submitted for review, Immigration Services must work with the Fraud Detection and National Security Directorate to determine what additional vetting and security checks are required. 2d Supp. Papazian Gosen Decl. ¶¶ 8, 9, 10. Only after completing all such checks with various agencies may the Asylum Office send the packet to Headquarters for final adjudication. 2d Supp. Papazian Gosen Decl. ¶¶ 8, 9, 10.

The Director of the Miami Asylum Office, Varsenik Papazian, confirms a specific timeline for Mezerhane Gosen's asylum application that tallies with the general process. An asylum officer provided an initial recommendation to grant the application on September 21, 2010. 2d Supp. Papazian Gosen Decl. ¶ 18(c). A supervisory asylum officer then reviewed the recommendation on September 28 and determined that Mezerhane Gosen's case fell within one of the categories of cases that requires Headquarters review. See 2d Supp. Papazian Gosen Decl. ¶ 18(d); see also Gosen Vaughn Index Bates No. 157 (a checklist form dated September 28 indicating that Headquarters must review and approve Mezerhane Gosen's application). There was no final decision to grant asylum on September 21, 2010, as Mezerhane Gosen alleges, see Gosen's Renewed Mot. for Summ. J. at 2, because the Supervisory Asylum Officer had not yet reviewed the application, the Fraud Detection and National Security Directorate had just started its vetting process, and Headquarters had not reviewed or approved any assessment. Papazian goes on to describe a long vetting process and eligibility assessment, followed by a new assessment to refer the case to an immigration judge, followed by a referral to Headquarters, followed by a non-concurrence, and then, finally, followed by a third assessment to grant asylum. 2d Supp. Papazian Gosen Decl. ¶ 18 (e)–(n). The Asylum Office received "written confirmation from [Headquarters]

that the case was cleared for final adjudication" on November 13, 2013. 2d Supp. Papazian Gosen Decl. ¶ 18(o).

The timeline in Mezerhane de Schnapp's case is similar, although with slightly different dates. On September 30, 2010, the Background Identity and Security Checklist was completed, and the Asylum Officer submitted his assessment to the Supervisory Asylum Officer. See 2d Supp. Decl. of Varsenik Papazian in Schnapp [ECF No. 30–2] ¶ 18(c). The Supervisory Asylum Officer reviewed the case and determined that the application fell within one of the categories that requires Headquarters review. 2d Supp. Papazian Schnapp Decl. ¶ 18(d). The application was then placed on hold pending an eligibility assessment and additional security checks by the Fraud Detection and National Security Directorate. 2d Supp. Papazian Schnapp Decl. ¶ 18(d). There was a delay in processing because the Fraud Detection and National Security Directorate found a pending investigation that could impact Mezerhane de Schnapp's eligibility, but by October 18, 2012, the vetting process was complete. 2d Supp. Papazian Schnapp Decl. ¶ 18(d). The Asylum Officer then reviewed the new information and drafted a new assessment and referral sheet. 2d Supp. Papazian Schnapp Decl. ¶ 18(f). And on November 13, 2013, the Asylum Office received written approval from Headquarters to grant Mezerhane de Schnapp asylum. 2d Supp. Papazian Schnapp Decl. ¶ 18(h).

This Court previously took issue with the government's argument that there is no "final decision" until a letter is mailed to an asylum-seeker notifying her of the decision to grant or deny her application. See Schnapp, 67 F. Supp. 3d at 108. At that stage of the litigation, it seemed that the government was relying on a mere formality to argue there had been no final decision in 2010.[5]

---

[5] Although some courts have suggested that the "final decision" in asylum cases is the "Decision Letter" or "Referral Notice" that notifies the applicant of the government's ultimate decision, see, e.g., Abtew v. U.S. Dep't of Homeland Sec., 47 F. Supp. 3d 98, 106 (D.D.C. 2014), such a formalistic definition would sidestep the Mezerhanes' real allegation—that the government violated 8 C.F.R. § 208.19, which requires it to notify applicants of its final

But now, it is clear that much of the process required to grant asylum—not just a letter of notification—was not yet complete in September 2010. The vetting and security check process had yet to run its course. And many of the documents at issue—which the Court has reviewed <u>in camera</u>—confirm that the internal vetting process was ongoing between 2010 and 2013. See <u>Gosen</u> <u>Vaughn</u> Index Bates Nos. 3–9, 28–29; <u>Schnapp</u> <u>Vaughn</u> Index Bates Nos. 248–53. This vetting, a prerequisite for Headquarters review, was incomplete in 2010; the government, then, could not have made a truly final decision to grant the Mezerhanes asylum at that time.

Moreover, Headquarters did not approve any asylum applications until November 2013. It is clear that its approval was not just a rubber stamp or a purely administrative step (such as sending a notice) because it issued a non-concurrence in response to the Asylum Office's recommendation to refer Mezerhane Gosen to an immigration judge. Headquarters thus required the Asylum Office to reevaluate, and ultimately reverse, its assessment. See 2d Supp. Papazian <u>Gosen</u> Decl. at ¶ 18(m), (n). The fact that the entire decision was reversed by Headquarters demonstrates that its review was a substantive and meaningful step in the approval process and that—at least on the facts here—no decision that requires Headquarters review could be "final" without its explicit approval. Thus, there was no final agency decision to grant asylum to the Mezerhanes until November 2013; the documents at issue here predated that decision and are thus protected under the deliberative-process privilege.

Of course, the Mezerhanes disagree—and highlight several incidents suggesting that the government made the decision to grant their asylum in September 2010. First, the Mezerhanes

---

decision, see <u>Schnapp</u>, 67 F. Supp. 3d at 108. Given the allegations here, the Court looks to determine when, substantively, the final decision was made to grant asylum instead of when the mere procedural act of sending a notice occurred. This approach is also consistent with the statutory language—"an applicant must . . . receive . . . receipt of the decision to grant or deny asylum"—as the language implies that a decision to grant or deny exists independent of the notification. 8 C.F.R. § 208.19.

10

obtained a database screenshot from the government's Refugees, Asylum and Parole System that identifies Mezerhane Gosen and states "FINAL DECISION: GRANTED" next to "DATE: 9/21/2010." Ex. E to Gosen's Mot. for Summ. J. [ECF No. 20–5] at 3. Second, an Immigration Services official allegedly told Mezerhane de Schnapp's husband, her derivative beneficiary, that he should not have filed for an "Advance Parole [Travel]" document because he had already been granted asylum. See Roberto Schnapp Aff. [ECF No. 18–5] at 5 ¶ 6. Documentary evidence corroborates his story: someone within the agency had marked his form for the travel document with red pen to indicate he should apply for a Refugee Travel Document, which is available only to asylees. See Ex. C to Schnapp's Mot. for Summ. J. [ECF No. 18–5] at 11. Third, the Mezerhanes allege that a government officer from Immigration Service's Ombudsman's Office told one of their attorneys that Mezerhane de Schnapp's family "already held asylum status." See Sandra Grossman Aff. in Schnapp [ECF No. 18–4] at 2–3 ¶¶ 6, 9(h). Fourth, Mezerhane de Schnapp overheard a DHS customs officer comment that her family was listed in DHS records as "asylees since 2010" when she was returning from a trip to the Bahamas. See Schnapp Aff. [ECF No. 15-5] ¶¶ 6, 7; Robert Schnapp Aff. ¶ 11. And finally, an ICE "Record of Action" document states that a database reflected that "asylum was granted for the principal wife . . . and her derivative spouse and children" as of September 30, 2010. Pl.'s Ex. K [ECF No. 37–1] at 4.

Although the government has not specifically refuted each of these alleged incidents,[6] it has offered a reasonable explanation that accounts for the Mezerhanes' experiences. Agency

---

[6] The government did specifically address the Mezerhanes' allegation that an Immigration Services employee from the Ombudsman Office, Veronica Vaughan, told attorney Sandra Grossman that the Mezerhanes had already received asylum. The government presented a declaration from Vaughan stating that she "did not confirm that the application for Ms. Grossman's client 'was granted as of September 2010,' according to the RAPS database" and does not even have access to the RAPS system. See Supp. Decl. Veronica Vaughan in Schnapp [ECF No. 32–2] ¶ 6. The Mezerhanes responded with emails corroborating Grossman's account, see Exhibits to Sandra Grossman Supp. Aff. in Schnapp [ECF No. 33–2] at 1–4, and another affidavit averring that although the Ombudsman Office does not have access to RAPS, it does have access to other databases that report the status of asylum applications, see Prakash Khatri Aff. in Gosen [ECF No. 41–1] ¶¶ 6–7. As explained below, the Court finds that the Papazian and Posont affidavits

11

counsel explains in her affidavit that "there was inaccurate information within USCIS databases that could be misleading to USCIS officers checking systems." Supp. Posont Gosen Decl. ¶ 9 (internal quotation marks omitted). She has explained that because no final decision had been served—and the RAPS database was corrected in January 2011—she believes that "the 9/30/10 data entry was a clerical error." Supp. Posont Gosen Decl. ¶ 11. Another USCIS database, CIS Nationals, may have continued to reflect the error beyond 2011 because the RAPS database had already "interfaced" the inaccurate grant information with CIS Nationals. And when USCIS manually corrected the RAPS entry, the correction did not update in the CIS Nationals database. Supp. Posont Gosen Decl. ¶ 9. That account explains both the RAPS screenshot and why government officials several times told the Mezerhanes that they had received asylum. The Mezerhanes have not offered any evidence "sufficient to put the Agency's good faith into doubt." Ground Saucer, 692 F.2d at 771. Although this Court does not know for certain whether the database entry was a simple clerical error or a misguided employee decision,[7] it is confident, given Papazian's specific timeline and Posont's declaration, that the 2010 entry did not reflect the final outcome of the official deliberative process required to grant asylum.[8] Since that process was not

---

do enough to explain the Mezerhanes' evidence and therefore reaches its conclusion without relying on the Vaughan Declaration.

[7] An email dated January 20, 2011, shortly before the RAPS database was manually corrected, suggests that the Fraud Detection and National Security Directorate believed that Mezerhane Gosen was going to be granted asylum. Gosen Vaughn Index Bates No. 29. However, the email requested additional security checks, which would not be necessary if the decision to grant was final. Gosen Vaughn Index Bates No. 29. Thus, agency officials may have anticipated the final decision, and entered it on RAPS accordingly, before doing everything required to actually make a final determination. The "correction of the clerical error" may have occurred in response to information received through the additional security checks.

[8] In FOIA cases, "[t]he court may grant summary judgment in favor of the government simply on the basis of the affidavits, if they 'contain information of reasonable detail, sufficient to place the documents within the exemption category, and if the information is not challenged by contrary evidence in the record or evidence of agency bad faith.'" Meeropol v. Meese, 790 F.2d 942, 958 (D.C. Cir. 1986) (quoting Lesar v. U.S. Dept. of Justice, 636 F.2d 472, 481 (D.C. Cir. 1980)). The Mezerhanes have provided no evidence contradicting the Papazian and Posont declarations. Rather, all of the Mezerhanes' evidence is consistent with the agency officials' accounts. No further discovery is warranted "when the affidavits are sufficiently detailed and submitted in good faith" and the Mezerhanes have failed to "submit any concrete evidence of bad faith." See Kay v. FCC, 976 F. Supp. 23, 34 n.35 (D.D.C. 1997), aff'd, 172 F.3d 919 (D.C. Cir. 1998). See also Defenders of Wildlife, 623 F. Supp. 2d at 87 ("FOIA cases typically

completed until November 2013, when final Headquarters approval of asylum occurred, the documents are predecisional and protected under Exemption 5.

Moreover, as the government points out, in order "[t]o establish that a document is predecisional, the agency need not point to an agency final decision, but merely establish what deliberative process is involved, and the role . . . that the documents at issue played in that process." Judicial Watch v. Export-Import Bank, 108 F. Supp. 2d 19, 35 (D.D.C. 2000). The purpose of the privilege is "to enhance 'the quality of agency decisions' by protecting open and frank discussion among those who make them within the [g]overnment." Dep't of Interior v. Klamath Water Users Protective Ass'n, 532 U.S. 1, 9 (2001) (internal citation omitted). "[O]fficials will not communicate candidly among themselves if each remark is a potential item of discovery and front page news." Id. at 8–9. And the content of the documents here makes clear that they are part of a deliberative process for a future decision.[9]

Regarding Schnapp, the remaining documents include a four-page "Asylum Officer Assessment" dated February 11, 2013, and a "Quality Assurance Referral Sheet" dated November 19, 2012. Schnapp Vaughn Index Bates Nos. 1–4, 246. The assessment reports "essential facts in support of the applicant's asylum application, and the Asylum Officer's analysis and recommendations." Schnapp Vaughn Index at 1. Such assessments are generally protected by the deliberative-process privilege. See Abramyan v. Dep't of Homeland Sec., 6 F. Supp. 3d 57, 66

---

and appropriately are decided on motions for summary judgment."). Thus, they have failed to raise a genuine issue of material fact.

[9] Some courts go so far as to apply the deliberative-process privilege even where there is no future decision as long as the documents were produced with the intent to inform a future decision. For example, an email regarding an agency decision that was sent after the decision was announced was deemed predecisional because the author of the email was probably not aware the decision had been announced. See N. Dartmouth Properties, Inc. v. U.S. Dep't of Hous. & Urban Dev., 984 F. Supp. 65, 69 (D. Mass. 1997). "No one would waste time preparing an email message in an attempt to persuade someone to reach a conclusion if he knew that the conclusion he was advocating had already been reached." Id. Likewise, there is no reason Immigration Services would have created all the documents it did after 2010 if the decision to grant asylum had already been reached.

(D.D.C. 2013). And Mezerhane de Schnapp's assessment was generated to inform a post-2010 decision, not just reflect a pre-existing one: it cites documents from 2011 and reflects research conducted in October 2012. Schnapp Vaughn Index Bates No. 3. Likewise, the Referral Sheet indicates that Mezerhane de Schnapp's case required additional Headquarters review and notes that the Quality Assurance Referral Packet was forwarded to Headquarters for that review on February 13, 2013. Schnapp Vaughn Index Bates No. 246.

As to Gosen, there are three remaining documents for which only Exemption 5 protection is sought. Gosen Vaughn Index Bates Nos. 1, 157, & 257–62. Two of those documents are quality assurance referral sheets, one dated September 28, 2010, and the other listing three dates in September and November of 2012. Gosen Vaughn Index Bates Nos. 1, 157. Both sheets indicate that Mezerhane Gosen's application requires Headquarters review. Id. The remaining document, another Asylum Officer Assessment, is dated both September 2010 and September 2012. Gosen Vaughn Index Bates Nos. 257–62. Again, the document cites sources from 2011 and reflects research conducted in 2012. Gosen Vaughn Index Bates Nos. 260–61.

Therefore, the content of the documents further confirms that they are in fact predecisional. No document presents the reasons for an alleged grant of asylum in 2010. Rather, the documents in dispute were "prepared in order to assist" the agency in making the November 2013 decision. Petroleum Info. Corp., 976 F.2d at 1434 (quoting Renegotiation Bd., 421 U.S. at 184) (internal quotation marks omitted). The documents thus exhibit the very essence of "predecisional" materials.

## II.   SEGREGABILITY

Even after an agency establishes that a particular FOIA exemption applies, "it must nonetheless disclose all reasonably segregable, non-exempt portions of the requested record(s)."

14

Assassination Archives & Research Ctr. v. CIA, 334 F.3d 55, 58 (D.C. Cir. 2003); see also 5 U.S.C. § 552(b).[10]  Courts cannot "simply approve the withholding of an entire document without entering a finding on segregability, or lack thereof." Schiller v. NLRB, 964 F.2d 1205, 1210 (D.C. Cir. 1992) (internal quotations omitted) (abrogated on other grounds in Milner v. Dep't of Navy, 562 U.S. 562 (2011)).  "[N]on-exempt portions of a document must be disclosed unless they are inextricably intertwined with exempt portions." Mead Data Ctr., Inc. v. U.S. Dep't of Air Force, 566 F.2d 242, 260 (D.C. Cir. 1977).

Generally, the deliberative-process privilege does not protect factual material, see National Sec. Archive v. CIA, 752 F.3d 460, 466 (D.C. Cir. 2014) (citing EPA v. Mink, 410 U.S. 73, 90 (1973), but factual material may sometimes be withheld if "its disclosure would expose the deliberative process," United Am. Fin., Inc. v. Potter, 531 F. Supp. 2d 29, 45 (D.D.C. 2008); see also Mapother v. Dep't of Justice, 3 F.3d 1533, 1539–40 (D.C. Cir. 1993) (suggesting that factual material "assembled through an exercise of judgment" may be protected, where a mere factual "inventory, presented in chronological order" would not be).  This Court recognizes that facts presented in an Assessment to Refer have been protected in the past. See Abramyan, 6 F. Supp. 3d at 65 (basing its decision on document descriptions in a Vaughn Index). However, in this case, unlike in Abramyan, this Court has had an opportunity for in camera review. And after in camera review, "[t]he focus . . . shifts from the Vaughn index to the actual relationship between the claimed exemptions and the redacted material." Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot., 2006 WL 1826185, at *3 (D.D.C. June 30, 2006).

---

[10] In the Mezerhanes' briefing on the renewed motions for summary judgment, Mezerhane Gosen requested that the Court "release all segregable portions of the remaining 22 pages." Gosen's Mem. in Opp. to Def's Renewed Mot. [ECF No. 41] at 10. Mezerhane de Schnapp did not make such a specific request, but under FOIA, courts have an independent obligation to determine whether nonexempt material can reasonably be segregated from exempt material.  See Powell v. U.S. Bureau of Prisons, 927 F.2d 1239, 1242 (D.C. Cir. 1991).

The Court has reviewed the documents in question[11] and finds that there is at least some factual material that may not expose the deliberative process. For example, both assessments begin with factual introductory information. See Gosen Vaughn Index Bates No. 257; Schnapp Vaughn Index Bates No. 1. The documents also include a paragraph that is (mostly) just a chronological list of what the applicant testified. See Schnapp Vaughn Index Bates No. 1. And there are several long quotes from various published reports. See Gosen Vaughn Index Bates Nos. 259–61; Schnapp Vaughn Index Bates Nos. 2–3. It is not entirely clear to the Court why the factual and quoted material in those reports would provide meaningful insight into the decisionmaker's judgment or the deliberative process. And a recommendation may not fall under the deliberative-process privilege if it is later "adopted . . . as the agency position on an issue or is used by the agency in its dealings with the public." Coastal States Gas, 617 F.2d at 866. This does not mean that deliberative analysis should be revealed, but it may require disclosing the actual conclusion of an assessment if that conclusion is later adopted as USCIS policy.

Although the Court has highlighted several areas where there may be reasonably segregable material, it also recognizes that courts should give "considerable deference" to an agency's judgment as to what constitutes "part of the agency give-and-take—of the deliberative process—by which the decision itself is made." Chemical Mfrs. Ass'n v. Consumer Product Safety Com'n, 600 F. Supp. 114, 118 (D.D.C. 1984) (internal quotations omitted). Thus, the Court will require the government to re-assess the remaining pages in dispute (that is, Schnapp Vaughn Index Bates Nos. 1–4 and 246 and Gosen Vaughn Index Bates Nos. 1, 157, and 257–62) and disclose all reasonably segregable portions of non-exempt material.

---

[11] The fourteen pages that were already protected under other FOIA exemptions are not in dispute with regard to segregability either. Another court in this district has already concluded "after careful in camera consideration of the relevant redactions, that all reasonably segregable information has been released" with regard to those documents. See Gosen, 2014 WL 6809183, at *3 n.3.

**CONCLUSION**

The Court will therefore deny Schnapp's renewed motion for summary judgment; grant in part and deny in part Gosen's renewed motion for summary judgment; and grant in part and deny in part the government's renewed motions for summary judgment. The Court will order the government to disclose all reasonably segregable portions of non-exempt material in the remaining documents (Schnapp Vaughn Index Bates Nos. 1–4 and 246; Gosen Vaughn Index Bates Nos. 1, 157, and 257–62). Two separate Orders have been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 30, 2015